LARRY G. NOVINGER AND COLLEEN R. NOVINGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAMES C. WITHERS AND HELGA A. WITHERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Novinger v. Commissioner
Docket Nos. 16052-88, 8586-89
United States Tax Court
T.C. Memo 1991-289; 1991 Tax Ct. Memo LEXIS 330; 61 T.C.M. (CCH) 3024; T.C.M. (RIA) 91289; June 27, 1991, Filed *330 Decisions will be entered under Rule 155. William J. James, for the petitioners. Andrew D. Weiss and Alison W. Lehr, for the respondent. Dawson, Judge. GUSSIS, Special Trial Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION These consolidated cases were assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7443A(b) of the Code and Rule 180 et seq. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE
GUSSIS, Special Trial Judge.
Respondent determined the following Federal income tax deficiencies, additions to tax, and increased interest for the year 1982: Additions to Tax and Increased Interest, Sections
Docket No.
Deficiency
6653(a)(1)
6653(a)(2)
6661
6659
6621(c)
16052-88
$ 10,159
$ 508
*
***  $ 3,048
****
(Novinger)
8586-89
7,681
384
**
1,920
--  ****
(Withers)
*331 Petitioners were involved in certain transactions with Omega Research & Development, a limited partnership, for the purchase of research and development hours. Petitioners, through their respective limited partnerships, claimed losses in 1982 with respect to these transactions which were disallowed in full. Petitioners now concede that they are not entitled to the deductions for losses and credits claimed by them on their respective 1982 returns in connection with their participation in these transactions, and they have conceded the relevant income tax deficiencies for the year 1982. The remaining issues are: (1) Whether petitioners are liable for additions to tax for negligence or intentional disregard of rules and regulations under section *332 6653(a)(1) and (2); (2) Whether petitioners in docket No. 16052-88 (Novinger) are liable for an addition to tax for valuation overstatements under section 6659; or, in the alternative, whether they are liable for an addition to tax for substantial understatement of income tax under section 6661; (3) Whether petitioners in docket No. 8586-89 (Withers) are liable for an addition to tax for substantial understatement of income tax under section 6661; (4) Whether petitioners are liable for an increased rate of interest on deficiencies attributable to tax motivated transactions under section 6621(c). FINDINGS OF FACT Some of the facts were stipulated and they are so found. Petitioners Larry and Colleen Novinger were residents of Portland, Oregon, at the time the petition in docket No. 16052-88 was filed. Petitioners James and Helga Withers (Withers) were residents of Tucson, Arizona, at the time the petition in docket No. 8586-89 was filed. Dennis Regan (Regan) formed the limited partnership, Omega Research & Development (Omega), in August 1981. Regan was general partner of Omega which also had one limited partner. Ron James marketed the Omega-related investments which were detailed *333 in the Omega offering brochure. Regan enrolled in certain electronics courses while in the military service and continued to take courses in related fields after he left the service in 1971. Prior to the period at issue, Regan engaged in television repair work and also did repairs on other electronic equipment. When Regan formed Omega in 1981, his stated project was to develop new ways to produce certain microelectronic devices. In 1982 Omega had two employees. In 1983, several engineers and technicians were employed. Omega had assets of $ 899 at the beginning of 1982. Omega offered research and development services to its clients at a rate of $ 300 per hour, with $ 50 payable in cash and the balance to be financed by Omega. Some 1,500 hours of research were done by Omega in 1982, and approximately 12,000 to 14,000 were done in 1983. In 1982 Omega sold about 19,900 research hours. The Omega offering brochure stated that Omega had invented a manufacturing system utilizing laser etching to produce high diversity computer chips with sixteen times more memory capacity than current state-of-the-art chips at about one-fourth the cost. Omega referred to its chips as memory system *334 components. The brochure stated that Omega expected to have a prototype of the memory system component working by June 1983, and to be able to produce limited quantities of memory system components by the end of 1983. An extensive legal opinion included in the brochure emphasized the tax aspects of the Omega program involving the sale of research and development hours. Purchasers who contracted for a block of research and development hours would receive the right to market the product of such research and development. The Omega program required a purchaser to form a limited partnership which would then acquire the designated hours of research and development from Omega. Regan designated Georgia C. Martin (Martin) to act as general partner for all partnerships formed pursuant to the purchase agreement, with each individual purchaser to act as limited partner. The tax benefit to initial cost ratio for investors in the Omega program was approximately five to one. Investors in the Omega program typically made a cash down payment and executed a promissory note for the balance of the cost of the research and development hours purchased. Respondent's expert witness, Kenneth Yu (Dr. *335 Yu), described the feasibility and technical challenges of the advanced 8 megabyte memory chip under development by Omega and the approach taken by Omega to develop and build the memory chip. Dr. Yu has a doctorate degree in electrical engineering from Stanford University. In 1984 Dr. Yu was co-founder of a corporation which developed and manufactured a high-speed laser fabrication machine used to write circuit patterns on chromes and wafers. In Dr. Yu's opinion a laser fabrication device comparable to the one envisaged by Omega did not exist in 1982, and any such machines developed as of 1990 still did not operate properly and, moreover, fell far short of the device proposed by Omega in 1982. With respect to the 8 megabyte memory chip, Dr. Yu stated that a memory chip with that capacity was not available on the market in 1982, that an 8 megabyte memory chip would be technically a very ambitious project, and that the Omega brochure did not disclose any pertinent technology on how a chip of that capacity was to be developed by Omega. Larry Novinger (Novinger) is a salesman of chemical and paper products. He has no expertise in micro-electronics or computers. He invested in the *336 Omega project after it was brought to his attention by an investment counselor. He also contacted his accountant with respect to the tax aspects of the investment. On December 21, 1982, petitioner entered into a research and development service contract with Omega pursuant to which he purchased 100 hours of research at $ 300 per hour. Novinger paid $ 5,000 in cash and executed a promissory note for the balance. On December 29, 1982, Novinger and Martin formed the Collar limited partnership and the research contract was transferred to the partnership. The stated business purposes of the partnership were to buy and sell micro-electronic components and to develop new methods to produce and manufacture micro-electronic components. No marketable micro-electric computer product or related technology was ever developed for the partnership. Omega and Regan provided Novinger and the partnership with promises, excuses for delays, and requests for additional funds. Neither Novinger nor the partnership entered into any research contracts with Omega or anyone else after 1982. Novinger never met Regan and never visited the Omega research facilities in Bakersfield, California. As part *337 of the arrangement for the purchase of research and development hours from Omega, Novinger became automatically entitled to shares of stock in a corporation called Ion Fabrications. In 1986 Novinger paid the principal of the $ 25,000 note in full by returning the Ion Fabrications stock to Omega. He paid the interest portion of the note with a cash payment of $ 500. On his 1982 return, Novinger claimed a partnership loss in the amount of $ 31,181 which was disallowed by respondent. Withers has a doctorate degree in physical chemistry and inorganic chemistry and has been involved since 1953 with research and development on a variety of materials. He has also worked on electronics research and development contracts. Withers has been a partner in a number of partnerships over the years that have engaged in research and development. Much of his work has involved thin film applications. Withers learned about Omega in October or November 1982, and discussed aspects of the Omega project with several individuals. He also contacted his attorney and accountant with respect to the legal aspects and the tax aspects of the proposed transaction offered by Omega. On December 21, 1982, Withers *338 and Martin formed the Tiffany Electronics limited partnership. The only business conducted by the partnership in 1982 was to enter into a research and development contract with Omega. Fifty hours of research and development services were acquired under the contract for a cash payment of $ 2,500 and a promissory note in the amount of $ 15,000. No marketable micro-electric computer product or related technology was ever developed for the Tiffany Electronics partnership. Omega and Regan provided Novinger and the partnership with promises, excuses for delays, and requests for additional funds. The Tiffany Electronics partnership has never completed a saleable product or entered into the market for computer related products and technology. Withers claimed a partnership loss in 1982 with respect to the Tiffany Electronics partnership in the amount of $ 15,812 which was disallowed by respondent. OPINION Petitioners entered into contracts with Omega in 1982 for designated hours of research and development services to be performed by Omega purportedly to find new and/or better methods to produce new micro-electronic components, innovative electronic circuits or related technology. *339 The Omega program required a purchaser of research and development services to form a limited partnership which would then acquire the designated block of research and development services. Petitioner Novinger formed a limited partnership (Collar) with Martin as general partner. Petitioner Withers also formed a limited partnership (Tiffany Electronics) with the same general partner as above. The stated business purpose of both partnerships was to buy and sell micro-electronic components and to develop new methods to produce and manufacture micro-electronic components. No marketable micro-electric computer product or related technology was ever developed by Omega for the Novinger limited partnership or the Withers limited partnership. Neither of the limited partnerships ever completed a saleable product or entered into the market for computer related products and technology. Petitioners concede on brief that their respective partnerships were not engaged in a trade or business. Petitioners Novinger and Withers have conceded that they are not entitled to losses or credits in 1982 resulting from their investment in their respective limited partnerships. 1. Section 6653(a) *340 Additions To Tax
Section 6653(a)(1) provides that, if any part of any underpayment of tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(2) provides that if any part of an underpayment of tax is due to negligence or intentional disregard of the rules and regulations, there shall be added to the tax, in addition to the 5 percent addition provided in section 6653(a)(1), an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. For the purposes of these sections, negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed correct, and petitioners bear the burden of proving otherwise. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. a Memorandum Opinion of the Court; Bixby v. Commissioner, 58 T.C. 757, 791 (1972). *341 A taxpayer cannot avoid the negligence addition to tax merely because his professional advisor has read the prospectus and has advised the taxpayer that it is feasible from a tax perspective, assuming the facts presented are true. See Rogers v. Commissioner, T.C. Memo 1990-619. Reliance upon professional advice is not an absolute defense to negligence. It must first be established that such reliance was reasonable. United States v. Boyle, 469 U.S. 241, 250, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985). Here we think that petitioners have not demonstrated that their reliance on professional advisors was reasonable. Moreover, the failure of petitioners to make a meaningful investigation beyond the promotional materials supplied by the sales people or to consult knowledgeable independent advisors was not reasonable or in keeping with the standard of the ordinarily prudent person. See Laverne v. Commissioner, 94 T.C. 637, 652-653 (1990). Withers testified that he consulted with his attorney and his accountant regarding the legal structure and tax aspects of the Omega investment and that he was advised that it was proper under the tax law and as a legal *342 matter. However, the record reveals that such advice was based for the most part on the information in the promotional materials provided by Withers, who testified succinctly that he simply took the Omega materials he received from Ron James and passed them on to "my accountant and lawyers and they said it was okay." It does not appear that the advisors had any expertise in the field of micro-electronics. Nor does it appear that they undertook any independent investigation into the feasibility of the concepts alluded to in the promotional material. Withers also testified that he discussed the Omega concepts with five "experts." However, there is nothing in the record to show that these discussions were anything more than casual conversations based on a cursory description of the Omega promotional materials. In any event, we are unaware of the nature of the conclusions reached by the "experts." Withers knew little about the size and scope of Regan's research operations. Novinger testified that he gave the Omega brochure to his accountant who gave Novinger a positive response with respect to the tax aspects of the Omega program. The accountant, on the basis of contacts with the *343 individuals who marketed the Omega program and conversations with Regan and an Omega employee and general inquiries regarding the Omega materials, simply indicated to Novinger that the Omega program presented a unique opportunity. Again, we are unpersuaded that these contacts and inquires were anything more than casual and routine efforts. Novinger also testified that he obtained positive responses from two other individuals. However, there is little in the record to explain the nature of the investigations, if any, made by these individuals as to the feasibility of the Omega program. Finally, there is no indication that Novinger made any independent effort to determine whether Omega was capable of doing the research it had contracted to perform or to verify any of the other information in the Omega brochures. The testimony of petitioners regarding the scope of their investigations into the technical feasibility of the Omega concepts for a purported dramatic break-through in the production of memory system components is singularly unpersuasive. As far as we can determine, the inquiries were casual and superficial in nature. We are not persuaded that petitioners had any real *344 comprehension of what it was Omega was proposing to develop or were genuinely concerned about the feasibility of the Omega claims. If petitioners had made a bona fide investigation for purposes of evaluating the profit potential of their investment, they would have discerned strong reasons to conclude that such profit potential did not exist. Martin was the general partner in petitioners' partnerships. Martin operated a dog kennel and also showed dogs in dog shows. Martin was not a C.P.A., an engineer, or a technical researcher, and there was nothing in this record that would tend to show she had any knowledge whatsoever of the micro electronics or computer business. Novinger knew nothing about Martin. He never met her. Nor did he undertake to investigate her qualifications regarding marketing, micro electronics, or anything else. Novinger indicated that he learned at the last minute that she was to be the general partner in his limited partnership. Withers similarly knew nothing about Martin, and had never met her. Withers did not undertake any investigation into Martin's qualifications, and testified that he chose Martin as general partner because "that was just part of *345 the deal of Omega -- she was the person." Under the terms of the research contracts, each of the limited partnerships had the right to market the micro electronic chips hoped to be developed by Omega. The limited partnership agreements provided: The General Partner shall have full and exclusive charge and control of the management, conduct and operation of the Partnership in all respects and in all matters. Limited partners shall contribute no services and shall take no part in or interfere in any manner with management, conduct, or control of the Partnership business * * *.
As general partner, Martin had the all encompassing power listed above to conduct all partnership affairs. Petitioners expressly had no power with respect to partnership matters. Yet neither petitioner felt it important enough to contact Martin and inquire as to her plans or her marketing strategy. We find it was negligent for petitioners to enter into this type of business arrangement with someone they knew absolutely nothing about and without making an effort to become better informed. Their lack of concern belies a bona fide objective of engaging in a legitimate business operation. Regan *346 testified that he was the general partner of Omega and that he managed it. He testified that his purpose in forming Omega was that he "wanted to sell [his] services and make money doing research and development." Neither of the petitioners knew anything about Regan. Nor did they undertake any serious investigation to determine his background. Neither of the petitioners made any meaningful investigation as to whether Regan possessed the requisite training and expertise to develop the micro-electronic chips described in the promotional materials. Any inquiry into Regan's background would have revealed that his previous work had been as a television and electronics repairman. There was little or no indication that his informal educational background prepared him for the awesome complexities in the development of the micro-electronic components here involved. In short, the actions of petitioners show an absence of any diligent and good faith effort to investigate the soundness of the Omega program. Accordingly, we conclude that petitioners are liable for the additions to tax under section 6653(a)(1) and (2). 2. Section 6659 Addition to Tax
Respondent determined that petitioner *347 Novinger was liable for the addition to tax under section 6659(a), which imposes a graduated addition to tax on an underpayment of tax attributable to a valuation overstatement. The underpayment attributable to the valuation overstatement must be at least $ 1,000. Sec. 6659(d). A valuation overstatement exists if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the correct value. Sec. 6659(c). Here petitioners have conceded that their respective partnerships were not engaged in a trade or business and hence are not entitled to any losses or credits in 1982 resulting from their participation in such partnerships. The underpayments in these cases are not attributable to a valuation overstatement. See McCrary v. Commissioner, 92 T.C. 827 (1989); Diamond v. Commissioner, 92 T.C. 423, 447 (1989), affd. 930 F.2d 372 (4th Cir. 1991); Smith v. Commissioner, 91 T.C. 733, 766 (1988), affd. sub nom. Karr v. Commissioner, 924 F.2d 1018 (11th Cir. 1991). We therefore conclude that section 6659 does not apply to any portion of the *348 underpayment in this case. 3. Section 6661 Additions to Tax
Respondent determined that petitioners Novinger and Withers are liable for the addition to tax under section 6661. Section 6661(a) imposes an addition to tax if there is a substantial understatement of income tax. An understatement is substantial when the understatement exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on the return. The amount of the addition to tax under section 6661(a) is equal to 25 percent of any underpayment attributable to the substantial understatement. The amount of the understatement may be reduced by an amount for which there was substantial authority for the treatment adopted by a taxpayer on his return (section 6661(b)(2)(B)(i)), or the relevant facts with respect to any item are adequately disclosed on the return (section 6661(b)(2)(B)(i)). In the case of a tax shelter, only the "substantial authority" exception is applicable. Moreover, the "substantial authority" exception is not available to reduce the underpayment in the case of a tax shelter unless, in addition, the taxpayer reasonably believed that the claimed tax treatment was "more likely *349 than not" the proper tax treatment. Sec. 6661(b)(2)(C)(i)(II). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership or other entity or investment plan or arrangement or any other plan or arrangement the principal purpose of which is the avoidance or evasion of Federal income tax. It is clear in the instant cases, and we so conclude, that the only purpose of the Omega program was the avoidance or evasion of Federal income tax. The transaction as structured by Omega was without economic substance. Petitioners have not shown that they reasonably believed that the tax treatment they claimed with respect to the research and development service contracts with Omega were more likely than not the proper tax treatment. It is clear on this record that petitioners Novinger and Withers did not sufficiently investigate and analyze the Omega program to enable them to formulate any reasonable belief one way or another as to whether their claimed tax treatment of the items here involved was more likely than not the proper tax treatment. Ferrell v. Commissioner, 90 T.C. 1154, 1205-1206 (1988). Nor do we believe that respondent abused his *350 discretion in refusing to waive the section 6661 addition to tax. Section 6661(c) permits respondent to waive the addition to tax if the taxpayer shows reasonable cause and good faith regarding the understatement. The most important factor in making the determination regarding waiver of the addition is the extent of the taxpayer's effort to assess his proper tax liability under the law. Sec. 1.6661-6(b), Income Tax Regs. Petitioners, notwithstanding their purported reliance on the professional advisors to establish the bona fides of the Omega transactions, have made no showing that there was reasonable cause for their understatements and that they acted in good faith. To the contrary, the record establishes to our satisfaction that the transactions were entered into by both petitioners purely to obtain the promised tax benefits and that petitioners were singularly unconcerned with the purported profit aspects of the transactions. On this record, we find that respondent did not abuse his discretion in denying a waiver of the addition pursuant to section 6661(c). See Mailman v. Commissioner, 91 T.C. 1079 (1988). Accordingly, we sustain respondent's imposition *351 of the additions to tax under section 6661. 4. Section 6621(c) Increased Interest
Section 6621(c) provides for an interest rate of 120 percent of the adjusted interest rate established under section 6601 if there is a "substantial underpayment" (an underpayment which exceeds $ 1,000) in any taxable year attributable to one or more "tax motivated transactions." The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Since petitioners have conceded that their respective limited partnership never engaged in a trade or business and hence they are not entitled to the partnership losses claimed, petitioners have not forced us to decide such issues. See and compare McCrary v. Commissioner, 92 T.C. 827, 854-855 (1989); and Rogers v. Commissioner, T.C. Memo 1990-619. Accordingly, we hold that the increased interest under section 6621(c) is not applicable in these cases. To reflect the concessions made by petitioners *352 and our conclusions on the disputed issues, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment of $ 10,159 attributable to negligence.↩
***. Will apply in the alternative to sec. 6659.↩
****. To be determined.↩
**. 50 percent of the interest due on the underpayment of $ 7,681 attributable to negligence.↩